

EXHIBIT
D
OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

STATE OF MICHIGAN

IN THE CIRCUIT COURT - FAMILY DIVISION FOR THE COUNTY OF ST. CLAIR

AMI MOELLER,

       Petitioner,

v

KEVIN JAMES LINDKE,

       Respondent.

Case No. T 2016-0741-PP
Hon. John D. Tomlinson

## OPINION AND ORDER REGARDING ORDER TO SHOW CAUSE OF MARCH 6, 2019, AGAINST RESPONDENT

This matter comes before the court on an order to show cause entered on March 6, 2019. In her motion requesting the order to show cause, Petitioner Ami Moeller ("Ami") asserted that Respondent Kevin Lindke ("Kevin") had violated the personal protection order (the "PPO") issued to her on March 31, 2016. Ami asserted was using the Facebook account "Keith Wesley" due to the fact his previous account "Kevin Lipa" was "currently blocked." Ami asserted Kevin was "attempting to communicate with" her using the new account, "speaking directly to me and about me, tagging me in comments," used the account "to post photos and posts from a very old Facebook account of mine," and posted an order from the custody case which included Ami's prior address. Kevin denied violating the PPO and the matter was set for hearing.

Hearing was conducted on September 13, 2019. The witnesses were Ami, Sgt. Michael Labeau, Ms. Megan Cary and Ms. Renee Burkhart.

## STATEMENT OF FACTS

### History

This matter is part of a larger litigation.[1]  It began on September 4, 2015, when Ami filed a complaint against Kevin in *Moeller v Lindke*, St. Clair County Circuit Court Case No. 15-

---

[1] The other related or ancillary matters include *Moeller v Lindke*, St. Clair County Circuit Court Case No. 15-2153-DC, and *Moeller v Lindke*, St. Clair County Circuit Court Case No. 15-2176-PP. The Court will take judicial notice of those proceedings and the matters that are contained in its files and records relating to those proceedings, as it is permitted to do. *See, e.g.,*

2153-DC, seeking to resolve custody and parenting time for the parties' minor child, Oaklei (born May 29, 2014).

This matter commenced on March 31, 2016, when Ami filed a petition seeking issuance of the PPO. This was Ami's second petition for a personal protection order against Kevin. Her first was granted by the court on September 9, 2015, in *Moeller v Lindke*, St. Clair County Circuit Court Case No. 15-2176-PP. In the petition in that matter, Ami noted that had been many physical altercations between Kevin and Ami during their 5 year relationship. She alleged that, during that time, she had been "slapped, hit, shoved, thrown, choked, suffocated, he has held me down and spit on my face. There have been many instances where police were called, but I never chose to press charges. I am regretting that at this time." She had been receiving harassment and threatening texts. Kevin had sent nude photos of her to her friends, family members, and all of the other employees at her place of employment. When the parties met to exchange O███ on August 30, 2015, Ami alleged Kevin said "You're lucky I don't beat the fuck out of you right now." Kevin appeared at Ami's mother's home, where she was staying, and sat in the driveway and honked his horn. When Ami went to her mother's boyfriend's home, Kevin appeared there three different times, banging on the doors and windows, even after being asked to leave. On the third occasion, he was arrested for stalking and resisting arrest. Petition, *Moeller v Lindke*, St. Clair County Circuit Court Case No. T 15-2176-PP.

On October 8, 2015, following an evidentiary hearing, the court found the PPO was properly granted, particularly given the proofs presented at the evidentiary hearing, and accordingly denied the motion to terminate the PPO. The court also found that Kevin had violated the personal protection order, and sentenced him to 30 days in jail. 10/8/15 Order, *Moeller v Lindke*, Case No 15-2176-PP.

On November 9, 2015, Ami filed another motion for an order to show cause, alleging Kevin had violated the PPO by, amongst other things, contacting her via text message on November 5, 2015, the day he had been released from jail, appeared at her residence on November 8, 2015, and knocked on the windows to her ground-level room, threatened to Ms. VanDrew his intent to pursue criminal charges against Ami if a resolution of the custody matters was not reached, and sat outside the courthouse for 25 minutes in his vehicle, after seeing Ami in the PPO office.

On December 9, 2015, Kevin pled guilty to another violation of the PPO. He was sentenced to 90 days in jail with credit for time served. The court permitted the sentence to run concurrently with a 90 day sentence imposed by the district court on Kevin's conviction for

---

*MRE 201(b), (c) and (e): see also Knowlton v Port Huron, 355 Mich. 448, 452 (1959), and Prawdzik v Heidema Bros., Inc., 352 Mich. 102, 112 (1958).*

2

resisting and obstructing, including determining whether good time should be awarded or a tether would be required as a condition of release.

In the meantime, matters proceeded in the underlying custody litigation. The court held a pretrial on January 28, 2016. Kevin was still incarcerated. He was offered the opportunity to appear in court, but declined transport. Accordingly, the court entered a default against him to permit the matter to proceed.

On February 11, 2016, the Court conducted a hearing to consider entry of a default order for custody. After hearing from both Ami and Kevin, and denying Kevin's motion to set aside the default, the court then entered an order that awarded sole legal and physical custody to Ami and continued the suspension of Kevin's parenting time until further order of the Court.

In her petition in this matter, Ami summarized the above information, including the fact that Kevin remained on probation and was wearing a tether, that she had sole physical and legal custody of O███ and that Kevin's parenting time remained suspended. She also stated:

> I filed on 9/15/2015 and was approved for a PPO that expired on March 9, 2016. I would have filed a motion to extend, had I known it was going to expire. Kevin has been stalking my social media accounts. He has posted multiple Facebook posts that directly reference me, attempting to make me look like a bad person + mother. There are pages and pages of comments from people who do not know me bashing me and attacking me. He posts something new about me almost daily. I have finally stopped looking, but have attached a number of such social media incidents. He has also sent a number of threatening texts to my friends, my mother, and my brother. Most of these state that everyone should enjoy their time with O███, because once he gets custody no one will see her. Kevin lives in a fantasy world, because none of his texts or posts are true. He is attempting to manipulate everyone. Yet again, he has been using social media to defamate [sic] my character. Petition, *Moeller v Lindke*, St. Clair County Circuit Court Case No. T 16-741-PP.

Ami also attached various examples of posts which had been made, which included posts from her Pinterest account, to which Kevin should have not had access, and posts from Kevin's mother's account which she maintained were made by Kevin.

Based upon the petition and the prior history of the relationship between the two, including Kevin's two convictions of criminal contempt due to violations of the original PPO, the court entered a new PPO on March 31, 2016.

During the pendency of this PPO, Kevin has violated it a total of three times. On February 21, 2017, Kevin was determined after hearing to have violated the PPO and sentenced to 25 days in jail. On February 12, 2018, Kevin was determined after hearing to have again

3

violated the PPO, and sentenced to 30 days in jail. On March 26, 2019, following hearing, Kevin was determined to have again violated the PPO and sentenced to 45 days in jail.

Kevin has also tried to terminate the PPO, not once, but twice, and abandoned his efforts both times. On April 13, 2016, Kevin filed a motion to terminate the PPO. Following a number of adjournments, and the filing of other motions, the matter was scheduled for hearing on October 4, 2016. On that date, the court entered a consent order, which, *inter alia*, provided that the evidentiary hearing scheduled for October 4, 2016, was "cancelled for the reason that the outstanding issues to be addressed at such hearing have been resolved" by the terms of the order. 10/4/2016 Consent Order, *Moeller v Lindke*, St. Clair County Circuit Court Case No. 15-2153-DC.

On January 25, 2018, as part of a status conference to discuss the then-pending motions before the court in this matter and the other related matters, Kevin's motion to terminate the PPO, which had been refiled on May 16, 2017, was again raised by Ms. Stern, as she asserted the motion had never been addressed by the Court. Following discussion with the attorneys, the Court scheduled the hearing on Ami's August 8, 2017 order to show cause and Kevin's motion to terminate the PPO for February 12, 2018. At the February 12, 2018 hearing, it was agreed by the parties that there were three matters which had not been addressed: an order to show cause filed by Ami on July 5, 2016, Kevin's motion to terminate the PPO, and an order to show cause filed by Ami on April 20, 2017. The court agreed, at the conclusion of the hearing, to schedule those matters for hearing on March 27, 2018. On March 27, 2018, at the date and time scheduled for the hearings on the July 5, 2016, and April 20, 2017, violations of that personal protection order and Kevin's motion to terminate Ami's PPO, Ami and Kevin entered into a global settlement which resolved all pending matters. 6/7/2018 Order, *Moeller v Lindke*, St. Clair County Circuit Court Case No. 15-2153-DC.

### Evidentiary Hearing

**Ami Moeller:** Ami testified that she, because of her previous relationship with Kevin and her familiarity with his online posts, was familiar with Kevin's voice both in person and on the phone and with his writing style and content when he was posting online.

Ami was also familiar with the name Keith Wesley, identifying that as the first and middle names of Kevin's biological father, who had passed away when Kevin was a baby.

On November 25 and 26, 2018, Ami was made aware of Facebook posts made under the name Keith Wesley. She obtained screenshots of them, which were admitted as Exhibit A. Ami identified the author as Kevin, asserting the recognized it by content and style of writing.

On page 7 of Exhibit A, Ami, on cross-examination, noted that one of the posts had actually tagged her, which causes Facebook to notify her of the fact she's been mentioned in the

4

post. Included with the later posts of photos and historical posts which had been made by Ami in 2014 and 2015, Ami concluded that Kevin was "trying to show me look what I have of your old Facebook."

On page 10 of Exhibit A, Ami identified a post attached to a picture of her, in which she had been tagged, that said "Two months after the last pic was taken Ami Renee kidnapped the little girl from her father and started exposing her to the creep in the woods. Great mom."

On February 25, 2019, Ami became aware of a post on the Justice for O███ Facebook page. A screenshot of the post was admitted as Exhibit B. Ami against identified the author as Kevin, again by considering the style and content.

On cross examination, Ami testified the Exhibit was posted on the Justice for O███ page. As she is not a member of that page, and was not tagged in it, she received a copy from someone else.

On redirect, Ami testified that Kevin had sent Exhibit B to her mother, Renee Burkhart, "in text, part of the posting, threatening me that he was going to post it." Burkhart told Ami about the text from Kevin.

**Megan Cary:** Megan Cary is Kevin's sister. She testified that she had created the Keith Wesley profile and had controlled the account from the date of its creation until she testified. When asked why she would choose the name of Kevin's deceased father, she replied "Well, the name was actually not come up by me, that was my mom [Jamie Murray] who came up with the name." Later, Ms. Cary testified "So I could of come up with some different name I guess. I mean I don't, I don't have an answer I guess why that name was used."

Ms. Cary denied she was trying to hide her identity, stating "I just feel that I wasn't trying to make anyone believe that I was a secret person. I didn't care if they knew that it was me posting necessarily, I just didn't want to lose my personal account." She testified that she had created the account "[b]ecause I didn't want certain posts that I made tied to my personal account because people have reported certain posts that were made and so I didn't want to lose my personal account if that happened." She also testified that she had been the person posting on the Keith Wesley account "the entire time." Later, Ms. Cary testified that "Keith Wesley has been around since Justice for O███ had been started, but sometimes I would use it for, to post things when I didn't want to get reported."

When asked about her motivations to create the Keith Wesley account, Ms. Cary reiterated that she didn't want to have any negative impact on her personal account (which is under the name "Meg Ashley"). She also testified that Ami had Ms. Cary's actual account blocked, so when someone told her that Ami had posted "things about my family, about my brother, on social media," she would use the Keith Wesley account to see what was being posted.

Ms. Cary denied having ever posted a message or comment that Kevin specifically asked her to post word for word on Facebook. She testified that the posts which served as the basis of Ami's motion were all posts that she had decided herself to post on Facebook and had authored. She denied that Kevin requested her to do so. However, on cross examination, Ms. Cary testified "Have Kevin and I had conversations about posts he might want me to make, absolutely. Have I done it just because he told me to do it, no."

Ms. Cary also testified she had created a Justice for O███ page, which is different than the Justice for O███ group. She used the Justice for O███ page to comment in the group, although she also commented with her personal Meg Ashley and her Keith Wesley accounts. Ms. Cary, when asked about why she just wouldn't post under the Justice for O███ page, testified "I don't really have an answer for that specific question. I told you why I made the Keith Wesley page and I know why I made the Justice for O███page, and there was - - you'd have to give me like a direct example of why I posted from a certain thing for me to be able to answer that question fully I think." Ms. Cary also admitted that her mother, her friend, Jessica, and she all had made posts from her Justice for O███ page.

Ms. Cary admitted that she was the individual talking to Kevin in the call talking about making a post on the Justice for O███site. She testified that she did not make any of the posts requested by Kevin. When asked to explain, she testified Kevin "never directs me to make any posts when he's, or asks me to make a post or anything like that on a normal basis. But some, when he was incarcerated I could just tell that his anxiety level was a little bit off and I think he just wanted a voice. But I would just kind of listen to what he was saying and I didn't feel it was necessary and I didn't feel that that's what I wanted on the page so I did not make the, the post."

On cross-examination, in discussing the call Kevin made to her from jail, which will be discussed below, the following exchange occurred:

MS. WEEKS: So when your brother [Kevin] says then make sure that you're posting as Keith Wesley too because that's going to underpin, mitigate their whole argument that it's me doing it, you know what I mean, you remember that statement?

MS. CARY: Uh-hum.

MS. WEEKS: Are you the only one who has access to that Keith Wesley page?

MS. CARY: My mom [Jamie Murray] does and my friend Jessica as well.

MS. WEEKS: But not Kevin?

MS. CARY: No.

MS. WEEKS: Is that true?

MS. CARY: There's, I don't really want him to have access to that page. I really don't want him to be posting from the Justice page either.

MS. WEEKS: Are you saying that any post from the Justice for [O███] page, on the Keith Wesley page are either made by you, your mom or Jessica?

MS. CARY: Uh-hum.

MS. WEEKS: And never from Kevin?

MS. CARY: It's not, I would have to go through each post, but as far as I know no.

MS. WEEKS: You've been here for a number of these hearings, right?

MS. CARY: Yeah.

MS. WEEKS: And you know that Kevin has admitted to making posts under Justice for O███ pages in some of these hearings, right?

MS. CARY: I'm guess -- I'm confused on what you're saying because you're bouncing back to Keith and then Justice and then --

MS. WEEKS: I know, it's confusing because there's a lot of different profiles, right?

MS. CARY: Yeah.

MS. WEEKS: So, are you telling me that Kevin does not have access to the Keith Wesley page.

MS. CARY: He does not have access to Keith Wesley.

MS. WEEKS: Is that true?

MS. CARY: That is true, yeah. But Justice for O███ I assume he has access to it because he admitted to – you're, it's confusing because there's a group and there's a page.

MS. WEEKS: I'm talking about the page.

MS. CARY: Okay, the page is me that posts to Justice for O███ under Justice for O███. And then a group Kevin can make posts on Justice for O███, and I believe he's made posts as himself from his own name.

MS. WEEKS: And you're telling me he doesn't have the user name and password of the Justice for O███ page, I'm talking about the page, not the group?

MS. CARY. I think so. Not Keith Wesley you're talking about, just Justice for O███?

7

MS. WEEKS: Yeah?

MS. CARY: Then yes.

When questioned about her understanding of perjury and its possible consequences at the end of this exchange, and asked if everything she had testified was true, Ms. Cary responded:

To the best that I understood the questions. I, I'm being honest with you. Sometimes what you're saying I get a little bit confused and it's confusing to try and explain a page, a group, my personal account, Keith Wesley, and then Kevin has his own name and all of that. So I'm trying my best to follow you.

Ms. Cary admitted making the posts under her Keith Wesley identity on page 8 and 9 of Exhibit A. Ms. Cary testified she had obtained the photos as follows:

So she [Ami], on her old Facebook page she deactivated it right around the time that this whole custody battle started. But she reactivated it a couple different times. And because we were still Facebook friends on that old account when she would reactivate it I could see all of those posts. So, when I saw that she did that I was curious as to why she was doing that so I screen shotted all of those posts that she had made because she was trying to say that a lot of different things about Kevin being a father and the bond with O███ and stuff and I thought that that's why she originally deactivated her old Facebook page. So I thought that maybe possibly all those pictures, I didn't know if [Kevin] had them all at the time or not, and I just screen shotted them off.

* * *

And so I screen shotted them all, so they were in my phone. So when I made these posts way after the fact during this conversation that happened I had them all.

Ms. Cary testified that she kept copies of Kevin's court records. She stated she began doing so once she was accused by Ami's attorney of having "snuck visits with O███," – "from that point forward and even a little bit before" – so that she would have "access to everything so that way if someone ever told another lie about me that I would be able to defend myself and I would remember what was said in the transcripts and all of those things."

On cross-examination, Ms. Cary was questioned about an incident involving an altercation Kevin had been involved in on July 4, 2017. Ultimately, Kevin was convicted of malicious destruction of property and sentenced to 123 days in jail. Shortly after the incident, Ms. Cary contacted the other driver's girlfriend in an effort to resolve the situation out of court. Ms. Cary testified that Kevin did not know of her involvement.

8

**Renee Burkhart:** Renee Burkhart testified that on February 11, 2019, she received a text message from Kevin that included the photograph of Ami from Exhibit B and a text message that stated "And if your family wants to continue to attack me personally what goes around comes around. I'm trying to protect my daughter. You all just want to attack me as a person, huge difference. So if this is how all you choose to do things so be it." Burkhart notified Ami of the messages and sent her a "screen grab" of the images.

Sgt. Labeau, an employee of the St. Clair County Sheriff's Department, in Corrections, laid foundation for five phone calls that were made by Kevin from March 27 to 30, 2019.

As a parenthetical, the court would note that the exchange that occurred at the end of the hearing conducted by the court on March 26, 2019, appears to be relevant here. After conducting an evidentiary hearing, the court found that there were two violations of the personal protection order in this matter and imposed a sentence of 45 days in the St. Clair County jail. After the court imposed the sentence, Kevin began talking to his friends and family in the audience, and a general uproar commenced, as follows:

> KEVIN: Put this, put this shit all over, put it all over the internet right now. All over it. Your days on the, your days on the bench are done.
>
> MR. MURRAY: Give me your phone, Kevin.
>
> KEVIN: It's all in there.

In addition to the call between Kevin and Ms. Cary, discussed below, there were earlier calls between Kevin and his former girlfriend, Jas, and Kevin's mother, Jamie Murray, as can be determined by the contents of the conversations. The transcripts of the excerpts introduced as Exhibit C at the hearing are attached to this opinion and order as Appendix A. In all of the excerpts presented to the court, Kevin is providing direction to the other participant in the conversation about online posts, including statements such as:

- "[Y]ou need to put up pictures of . . . the two idiots that are having a huge problem being posted on the page . . . put their pictures, put their posts, put where they work and tell people they should call their job and complain about them."

- "Well, I told Mom too it's time to just start fucking putting Ami [Moeller] and Tina front and center on the Justice page . . . picture, everything."

- "I need you to write something down and then I want you to text it to my Mom and tell her to post it on the Justice page as Justice for O███ . . . . Just put you cannot, um, you will not break the bond between O███ and I . . . . And then the next sentence that I want – like I want her [to] type it as like that as [sic] one sentence and then a double space, you know what I mean . . . . Then the next one says, um, you will not break my will . . . . And

then the last sentence is you will not break me . . . . And then tell her, you know, like one sentence, type the first sentence and then space down twice, type the second sentence . . . . I mean she'll know if you just give her the stuff, you know what I mean, but yeah, if you write it – whatever so she'll figure it out. But tell her to post it from as Justice for O██████. She'll have to do it on my phone."

- "Did Jaz text you? . . . All right. Yeah, just post that, um, as soon as you can, um, as the Justice for O█████ page though . . . when you post it like post the first sentence and then space, you know, two spaces . . . [a]nd then post the second sentence and then two spaces. Post the third sentence. You know what I mean? Like you know how I do it on there?"

The phone call between Kevin and Ms. Cary occurred on March 30, 2019, from 3:57:36 p.m. to 4:04:10 p.m. The relevant portions of the call are as follows:

> KEVIN: Are you posting as yourself or as Justice, as Justice page?
>
> MS. CARY: As myself.
>
> KEVIN: Then you have the log in information though for my account, don't you?
>
> MS. CARY: For your private one?
>
> KEVIN: Yeah, has -- yeah.
>
> MS. CARY: Yeah.
>
> KEVIN: Has anyone posted as Justice for O█████ at all?
>
> MS. CARY: Ah, Mom did.
>
> KEVIN: All right. It's important that that, you post under Justice for O█████
>
> MS. CARY: I'll make sure that she does.
>
> ＊ ＊ ＊
>
> KEVIN: So, and then, ah, then make sure that you're posting in Keith Wesley too.
>
> MS. CARY: All right.

KEVIN: Because that's going to fucking, under, that's just going to negate their whole argument that it's me doing it, you know what I mean?

MS. CARY: Right.

KEVIN: It's like I wanted to ask Tina too, like how do you know that Justice for Oaklei isn't posting when I'm in jail, why are you on the page? You know what I mean?

MS. CARY: Right. All that's just ridiculous. It's just, oh man. He just allows people to lie, so that's the part that's frustrating.

KEVIN: I just can't believe this many people are just flat out fucking liars. And if they lie --

MS. CARY: Well, I can't believe that he knows they're lying. I mean anyone would of -- he knew Renee was flat out lying.

KEVIN: Oh yeah.

MS. CARY: He just doesn't care.

KEVIN: He's a fucking liar too. You know what I mean?

MS. CARY: Right.

KEVIN: So, like they, they don't have any problem fucking lying to cover their own ass or get what they want. It's fucking disgusting.

MS. CARY: It is because everything that we said is the truth, so that's what's really --

KEVIN: Right.

MS. CARY: -- like --

KEVIN: Did Brenda Russell ever get back to you?

MS. CARY: No. I can call her again on Monday.

\* \* \*

KEVIN: Whatever.

MS. CARY: It's just annoying, like everything's a waiting game.

KEVIN: Yep.

11

MS. CARY: And in the meantime like you're in jail for nothing.

KEVIN: Right. It's a bunch of bullshit. Whatever. If you see any posts from Tina -- oh. what else you needed to do post under the Justice page, post a picture of Ami, Renee and Tina and say this is O███'s maternal family who conspired together with the Prosecutor's office and the Judge to once again have O███'s father thrown into jail illegally and for --

MS. CARY: Okay.

KEVIN: -- no reason whatsoever. But post all three of their pictures.

MS. CARY: All right.

KEVIN: And you should be able to pull them off some of those other posts, you know what I mean?

MS. CARY: Yes, I have all of the posts on there.

KEVIN: But post that as a Justice for O███.

## LEGAL AUTHORITY

A person "who refuses or fails to comply" with a PPO may be prosecuted for criminal contempt." MCL 600.2950(23). The violation must be proven beyond a reasonable doubt. MCR 3.708(H)(3); *People v Little*, 115 Mich. App 662, 65 (1982). To prove criminal contempt, the prosecutor or complainant must establish that the respondent "willfully disregarded or disobeyed the court's order or authority, that the contempt is clearly shown, and that the act posed an 'imminent threat to the administration of justice,' rather than merely offending 'the sensitivities of the judge.'" *In re Contempt of Rapanos*, 143 Mich. App. 483, 488-489 (1985). "Circumstantial evidence and the reasonable inferences arising from that evidence can be used to establish the elements." *People v Nowack*, 462 Mich.. 392, 400 (2000).

MCL 750.411h(1)(d) defines "stalking" as "a willful course of conduct involving repeated or continuing harassment that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed or molested and that actually causes the victim to feel terrorized, frightened. intimidated. threatened. harassed, or molested." MCL 750.411h(1)(d).

"Course of conduct" is defined as "a pattern of conduct composed of a series of 2 or more separate noncontinuous acts evidencing a continuity of purpose." MCL 750.411h(1)(a).

"Harassment," in turn, is defined as "conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable person to suffer emotional distress and that actually causes the victim to suffer emotional distress. Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose." MCL 750.411h(1)(c).

"Unconsented contact" means "any contact with another individual that is initiated or continued without that individual's consent or in disregard of that individual's expressed desire that the contact be avoided or discontinued," and can include "following or appearing within the sight of that individual," "approaching or confronting that individual in a public place or on private property," or "sending mail or electronic communications to that individual." MCL 750.411h(1)(e).

MCL 750.411h excludes constitutionally protected speech or activity from behavior that can be found to constitute stalking. MCL 750.411h(1)(c). As a result, even if the court finds Respondent's conduct has violated the PPO, it must determine whether the violative conduct is protected speech or activity. *See Nastal* v *Henderson & Assoc Investigations, Inc.*, 471 Mich. 712, 723 (2005)("[C]onduct that is constitutionally protected or serves a legitimate purpose cannot constitute harassment, or derivatively, stalking.")

"The United States and Michigan Constitutions provide the same protections of the freedom of speech, and this Court does not interpret the Michigan Constitution's protections of speech more broadly than the federal constitution's protections." *Thomas M Cooley Law School* v *Doe 1*, 300 Mich. App. 245, 256 (2013); *In re Contempt of Dudzinski*, 257 Mich. App. 96, 107 (2003).

"The First Amendment, applicable to the states through the Fourteenth Amendment, provides that 'Congress shall make no law . . . abridging the freedom of speech.' *Virginia* v *Black*, 538 U.S. 343, 358; 123 S.Ct. 1536; 155 L.Ed.2d 535 (2003), quoting US Const, Am I. 'The United States Supreme Court has held that the federal constitution protects speech over the Internet to the same extent as speech over other media.' 300 Mich. App. 245, 256 (2013), citing *Reno* v *American Civil Liberties Union*, 521 U.S. 844, 870; 117 S.Ct. 2329; 138 L.Ed.2d 874 (1997)). However, the 'right to speak freely is not absolute.' *Cooley*, 300 Mich. App. at 256, citing *Chaplinsky* v *New Hampshire*, 315 U.S. 568, 571; 62 S.Ct. 766; 86 L.Ed. 1031 (1942)." *TM* v *MZ*, 326 Mich. App. 237, 237 (2018).

Direct communication, at least with the holder of a personal protection order, is not constitutionally protected. Balanced against a right to free speech is "[t]he unwilling listener's interest in avoiding unwanted communication," which has been "repeatedly identified" in cases before the United States Supreme Court. *Hill* v *Colorado*, 530 U.S. 703, 716; 120 S.Ct. 2480;

147 L.Ed.2d 597 (2000). In *PLT* v *JBP*, 2019 WL 7206134 (Mich. App., Docket No. 346948), December 26, 2019, slip op at 4, the Court of Appeals noted that other constitutional rights must also be considered:

> In contrast to an individual's right to free speech, the "right to be let alone" has been characterized by the United States Supreme Court as "the most comprehensive of rights and the right most valued by civilized men." While individuals do have the contrary "right to persuade," "no one has a right to press even 'good' ideas on an unwilling recipient. When balancing these competing rights, "the right of every person 'to be let alone' must be placed in the scales with the right of others to communicate." *Id.* (quoting *Hill, supra*)(citations omitted.)

In balancing these interests, the court found that the respondent's conduct, which involved continued approaches to someone who had clearly asked to be let alone, was not constitutionally protected "because respondent violated petitioner's right to be let alone when he repeatedly attempted to press his ideas on an unwilling participant." *Id.*

Similarly, in the context of determining whether a PPO barred future communication by respondent to petitioner, a panel of the Michigan Court of Appeals, citing *Hill*, acknowledged this required balancing of interests, noting "it is not plain the provision of the PPO barring respondent from sending communications to petitioner violates the constitutional right to freedom of speech where in obtaining the PPO petitioner effectively made clear that she did not wish to receive communications from respondent." *Peterson* v *Peterson*, 2008 WL 2439888 (Mich. App., Docket No 283188), June 17, 2008, slip op at 5.[2]

Generally, regarding indirect communication, there are four categories of speech which may arise in consideration of a personal protection order that are not constitutionally protected: fighting words, inciting or producing imminent lawless action, true threats, and defamatory or libelous statements. *Id.* at 243.

---

[2] While the court is mindful of the provisions of MCR 7.215(C)(1), which provides that unpublished decisions are not binding on the court under the rule of stare decisis, the court "may nonetheless consider such opinions for their instructive or persuasive value." *Cox* v *Hartman*, 322 Mich. App. 292, 307 (2017); *Paris Meadows, LLC* v *City of Kentwood*, 287 Mich. App. 136, 145 n. 3 (2010). The court is citing these unpublished decisions because of the limited published decisions and the cogent analysis of the First Amendment issues presented in situations which are analogous to the situation presented here.

## ANALYSIS

The behavior complained of are a number of posts which were placed on the Justice for O█ group under the alias Keith Wesley. The posts highlighted by Ami include the following:

(1) Exhibit A, Page 3, Message in the left column posted by Kevin Lindke as "Keith Wesley", "Hey Ami, Larry testified on Friday under Kevin's cross examination that he has been playing with O█ within the last few weeks. He also testified that Ron Moeller brings her to the shack. Bet they didn't tell you about that."

(2) Exhibit A, Page 5, Message in the left column posted by Kevin Lindke as "Keith Wesley", "He was forced to. You honestly believe a father would sign off in [sic] his kid while the mother is allowing her around a violent sex offender?"

(3) Exhibit A, Page 6, Message in the left column posted by Kevin Lindke as "Keith Wesley", "None of that was a factor in this case. Ami Renee (the mom) has been using a ppo to jail the father, yet you see how much she talked about him on here. Really weird to have a ppo against someone just because they post Father's Rights [sic] memes."

(4) Exhibit A, Page 7, Message in the left column posted by Kevin Lindke as "Keith Wesley", "All the while the mother who has never made an issue out of his charges. The drug charge was a medical marijuana charge that he took so the mother didn't get in trouble. Ask Ami Renee."

(5) Exhibit A, Page 8 and blown up on Page 10, Message in the right column posted by Kevin Lindke as "Keith Wesley", "Two months after the last pic was taken, Ami Renee kidnapped the little girl from her father and started exposing her to the creep in the woods. Great mom."

(6) Exhibit A, Page 11, Message in the left and right column posted by Kevin Lindke as "Keith Wesley" with a photograph of a court order listing Ami Moeller's residential address on a public forum.

(7) Exhibit B, Message and photos of Ami Moeller with a cigarette posted by Kevin Lindke as "Justice for O█", Attorney Dana VanDrew at Fletcher, Fealko, Shoudy and Francis used her personal connection to Judge John Tomlinson to have any and all reports that detail O█'s mother's documented drug use to be HIDDEN from the court file."

Kevin's first argument is that the PPO should not have been issued because it constitutes a prior restraint on his right to Free Speech.

The court first finds that Kevin's argument must fail because when raised by motion, it was abandoned without resolution, and it wasn't raised at prior hearings addressing whether Kevin had violated the PPO. These acts constitute a waiver of Kevin's ability to raise the defense now. As set forth above, Kevin has twice sought termination of the PPO, but abandoned those efforts as part of the settlement of larger issues, both on October 4, 2016, and June 7, 2018.

The failure to address the issue as part of the resolutions reached constitutes an abandonment of the argument. There were also numerous violation hearings (specifically including those where the court found Kevin had violated the PPO and imposed a consequence, February 21, 2017, February 12, 2018, and March 26, 2019), where the argument wasn't raised. Both of these circumstances constitute a waiver of the argument, and accordingly it must be dismissed.

Even if not waived, Kevin's argument fails on the merits. The PPO was properly granted. There is nothing in the PPO that creates any limitation on Kevin's ability to engage in constitutionally protected speech. While the PPO prohibits behavior that would constitute stalking, pursuant to MCL 750.411h(1)(c), constitutionally protected activity is specifically excluded from the definition of harassment, which in turn is a necessary element to find that stalking has occurred. MCL 750.411h(1)(d). Michigan's statutory scheme regarding stalking in a PPO precludes a PPO from constituting prior restraint, because the statute provides that stalking cannot include constitutionally protected activity. The PPO, as written, did not place a prior restraint on Kevin's constitutionally protected activity, and accordingly does not constitute a prior restraint.

Kevin also asserts that Ami has not established beyond a reasonable doubt that he has violated the PPO. This argument is based upon Ms. Cary's testimony that the posts in question were all posts that she had decided herself to post on Facebook and had authored. She denied that Kevin requested her to do so. The issue is not so easily resolved.

First, Ami testified that she had been subjected to similar posts from Kevin since the inception of their custody dispute. She testified she had acquired familiarity with Kevin's posts through his ongoing course of conduct. Given those experiences, Ami believed, based upon the subject matter and the content of the posts, that they were authored by Kevin.

Second, the transcripts of the phone calls, although they occurred after the posts which serve as the basis for Ami's motion, demonstrate clearly that Kevin, Ms. Cary, their mother, Ms. Murray, and Jas have engaged in concerted action to engage in conduct that could constitute stalking if charged criminally. In those calls, Kevin gives direction to Ms. Cary, Ms. Murray, and Jas about what to post, what identity to use, and even goes so far to dictate one of the posts, complete with formatting. The conversations also detail that there is sharing of passwords and permission given to post under various identities. This level of cooperation didn't occur in the few days after Kevin was incarcerated. Instead, the ease of these communications demonstrates that these types of conversations had occurred previously. While circumstantial, the court finds the calls support a conclusion that these posts were part of a concerted activity between Kevin and others.

The level of coordination was confirmed in Ms. Cary's testimony. Ms. Cary testified that she and Kevin "had conversations about the posts [Kevin] might want me to make, absolutely." Ms. Cary created the Keith Wesley identity, following Ms. Murray's suggestion as to what it

16

should be named, because she was concerned if she made posts under her personal account that it may be blocked.   Ms. Cary testified that a number of people had the information necessary to post as Keith Wesley (including herself, Ms. Murray, and her friend, Jessica) and as Justice for O███ (including the same three individuals).

Additionally, Kevin's delivery of his cell phone to his stepfather, Mr. Murray, in the immediate aftermath of being remanded to jail, with instructions to "put this, put this shit all over, put it all over the internet right now. All over it," and the statement "It's all in there," shows both preparation and coordination of effort, as well as the audacity to make the hand-off on the record.

Finally, and most telling, is the inclusion in the post of the same photograph of Ami which had been sent to Ms. Burkhart a few weeks before by Kevin, together with the threat, "And if your family wants to continue to attack me personally, what goes around comes around." Petitioner's Exhibit D. It simply beggars belief that Kevin and Ms. Cary independently chose to use the same photograph to first threaten Ms. Burkhart with "what goes around comes around" and then, shortly after, to post online on the Justice for O███ page under an alias.

Accordingly, the court finds, taking all of the evidence into consideration, Ami has established that Kevin either authored or, alternatively, directed or conspired with Ms. Cary to make the posts which she now claims she authored and, because their discussions were in furtherance of stalking Ami, the posts may constitute violations of the PPO.[3]

Turning to the issue of whether the posts themselves violated the PPO, the court finds that the posts constitute stalking, as that is defined in MCL 750.411h. These continued posts demonstrate "a willful course of conduct," directly conducted or orchestrated by Kevin, "involving repeated or continuing harassment" through online posts, "that would cause a reasonable person to feel . . . harassed or molested" and that actually caused Ami "to feel harassed or molested." As set forth more fully in other opinions of this court, these posts are simply the latest in a ongoing course of conduct, going back since the inception of the custody dispute between Ami and Kevin. Those contacts have created emotional distress for anyone exposed to them for more than three and a half years, and have clearly created emotional distress for Ami.

---

[3] While the court is aware that, in a criminal context, the principal is not liable for the acts of an agent for a specific intent crime unless there is an express provision creating vicarious liability, *see People* v *Hock Shop, Inc.*, 261 Mich. App. 521 (2004), the court thinks the present matter is more akin to a conspiracy to engage in stalking, which is prohibited by MCL 750.157a.   Kevin is prohibited by the PPO from engaging in stalking. The court finds conspiring or coordinating with others to undertake actions which would constitute a violation of the PPO if taken personally, and which are taken, constitutes a violation of the PPO.

However, the inquiry cannot end there. Even though the conduct constitutes stalking, the court must determine whether the violative conduct is protected speech or activity. *Nastal*, 471 Mich. at 723.

Most of the posts were not direct communications to Ami. As set forth above, they were posts which were made online, discussing various aspects of the case. Given the nature of the speech and the First Amendment, Ami would have to establish that the speech was not constitutionally protected.

Ami's testimony focused on two specific posts: the one finding that she had "kidnapped" her child, Petitioner's Exhibit A, pp. 8 and 10, and the ones accusing her of having committed a drug offense, Petitioner's Exhibit A, p. 7, and Exhibit B. Ami argues that these posts, because they are untrue and accuse her of committing a crime, constitute defamation *per se* and are, accordingly, not protected speech. Ami makes no argument as to how the remaining posts are not protected speech. Review of them shows no obvious reason they would not be constitutionally protected. Accordingly, the court will limit its analysis to the specific provisions raised by Ami.

The court finds the post relating to Ami kidnapping her child, Exhibit A, pp. 8 and 10, when read in context, does not rise to the level of an accusation of a crime. Unfortunately, the word "kidnapped" is often used to discuss situations where one parent is seen as prohibiting contact with another parent. That appears to be the context here. Accordingly, the court finds that post is protected speech.

Exhibit B accuses Ami ("O███'s mother") of having "documented drug use" and of "smoking marijuana next to O███." Petitioner's Exhibit B. Ami testified that she was smoking "a cigarette or a marijuana cigarette" in the photograph. Because "[t]ruth is an absolute defense to a defamation claim," *TM*, 326 Mich. App. at 242, this post also constitutes protected speech.

Finally, the post accusing Ami of having committed a drug offense, Petitioner's Exhibit A, p. 7, is clearly provable as false. There was no testimony or other evidence introduced at hearing that would prove the truth or falsity of the allegation. If false, then the post would be defamation *per se*, and accordingly would not be protected speech. Ami did not satisfy her burden of proof that the speech was false, and accordingly this speech does not constitute a violation on this record.

However, Exhibit A, p. 7, is also the only post which was a direct communication to Ami. Ami testified that she was "tagged" in the post, which means that, when her contact information was typed into the post, she received a notification that the post had been made. Ami, by obtaining the PPO, had made it clear to Kevin that she did not want communications from him. *See Peterson*, *supra*, slip op at p. 5. "Tagging" Ami in the post violated Ami's constitutional "right to be let alone," and is not constitutionally protected speech. *PLT*, *supra*, slip op at 4. Because the speech is not constitutionally protected, it is a violation of the PPO.

18

Because Kevin has violated the PPO as set forth above, the court will schedule the matter for sentencing on August 4, 2020, commencing at 9:00 a.m.

Hon. John D. Tomlinson
Probate Judge, Family Division

Dated: June 16, 2020

A TRUE COPY
Jay M. DeBoyer
County Clerk

19

# APPENDIX A

1              (March 27, 2019, Call 1, 1:43 to 2:16.)

2

3              MR. LINDKE:  And then you need to put up

4     pictures of Tweedle Dee and Tweedle Dumb, put up where

5     they work and tell people to call and complain about them.

6              FEMALE VOICE:  Who's Tweedle Dee and Tweedle

7     Dumb?

8              MR. LINDKE:  Take a guess.

9              FEMALE VOICE:  Hum.

10             MR. LINDKE:  Who were the two idiots that are

11    having a huge problem with being posted on the page?

12             FEMALE VOICE:  Oh yeah.

13             MR. LINDKE:  All right.  So, put their pictures,

14    put their posts, put where they work and tell people they

15    should call their job and complain about them.

16             FEMALE VOICE:  Right.

17             MR. LINDKE:  They want to test this fucking

18    person on this shit, well I'm going to tell them, now

19    they're going to see what can really happen with it.

20             FEMALE VOICE:  Right.

21

22             (March 27, 2019, Call 2, 11:34 to 12:07.)

23

24             MR. LINDKE:  Right.  Well, I told Mom too it's

25    time to just start fucking putting Ami and Tina front and

1     center on the Justice page.

2             FEMALE VOICE:  Putting them on there?

3             MR. LINDKE:  What, yeah, picture, everything.

4             FEMALE VOICE:  Well, I don't have a problem like

5     posting about her and then posting right where she says

6     she doesn't tell Ami.  I can cut out the rest of it.

7             MR. LINDKE:  I'm just saying that post can just

8     get done under the Justice for O█████ tag and just, I

9     would just, I'd put Ami front and center now.  Fuck her.

10    Because I'm in jail so it ain't me doing it, you know what

11    I mean?

12            FEMALE VOICE:  Right.

13

14           (March 28, 2019, Call 3, 0:59 to 2:26.)

15

16            FEMALE VOICE:  Yep.

17            MR. LINDKE:  All right.  You got a, grab a

18    pencil, I need you to write something down and then I want

19    you to text it to my Mom and tell her to post it on the

20    Justice page as Justice for O█████.

21            FEMALE VOICE:  Okay.  I have a pen.

22            MR. LINDKE:  You got a paper?

23            FEMALE VOICE:  Uh-hum.

24            MR. LINDKE:  All right.  Just put you cannot,

25    um, you will not break the bond between O█████ and I.

1          (March 27, 2019, Call 1, 1:43 to 2:16.)

2

3          MR. LINDKE:  And then you need to put up

4  pictures of Tweedle Dee and Tweedle Dumb, put up where

5  they work and tell people to call and complain about them.

6          FEMALE VOICE:  Who's Tweedle Dee and Tweedle

7  Dumb?

8          MR. LINDKE:  Take a guess.

9          FEMALE VOICE:  Hum.

10         MR. LINDKE:  Who were the two idiots that are

11 having a huge problem with being posted on the page?

12         FEMALE VOICE:  Oh yeah.

13         MR. LINDKE:  All right.  So, put their pictures,

14 put their posts, put where they work and tell people they

15 should call their job and complain about them.

16         FEMALE VOICE:  Right.

17         MR. LINDKE:  They want to test this fucking

18 person on this shit, well I'm going to tell them, now

19 they're going to see what can really happen with it.

20         FEMALE VOICE:  Right.

21

22         (March 27, 2019, Call 2, 11:34 to 12:07.)

23

24         MR. LINDKE:  Right.  Well, I told Mom too it's

25 time to just start fucking putting Ami and Tina front and

                           1

```
 1      center on the Justice page.

 2              FEMALE VOICE:  Putting them on there?

 3              MR. LINDKE:  What, yeah, picture, everything.

 4              FEMALE VOICE:  Well, I don't have a problem like

 5      posting about her and then posting right where she says

 6      she doesn't tell Ami.  I can cut out the rest of it.

 7              MR. LINDKE:  I'm just saying that post can just

 8      get done under the Justice for O█████ tag and just, I

 9      would just, I'd put Ami front and center now.  Fuck her.

10      Because I'm in jail so it ain't me doing it, you know what

11      I mean?

12              FEMALE VOICE:  Right.

13

14              (March 28, 2019, Call 3, 0:59 to 2:26.)

15

16              FEMALE VOICE:  Yep.

17              MR. LINDKE:  All right.  You got a, grab a

18      pencil, I need you to write something down and then I want

19      you to text it to my Mom and tell her to post it on the

20      Justice page as Justice for O█████

21              FEMALE VOICE:  Okay.  I have a pen.

22              MR. LINDKE:  You got a paper?

23              FEMALE VOICE:  Uh-hum.

24              MR. LINDKE:  All right.  Just put you cannot,

25      um, you will not break the bond between O█████ and I.
```

```
1                      FEMALE VOICE:  Is that it?

2                      MR. LINDKE:  Nope.  And then the next sentence

3          that I want -- like I want her type it as like that as one

4          sentence and then a double space, you know what I mean?

5                      FEMALE VOICE:  Okay.

6                      MR. LINDKE:  The next sentence.  Like you see

7          how I, how it's posted on, you'll, you'll figure it out.

8                      FEMALE VOICE:  Yeah --

9                      MR. LINDKE:  And the next one says --

10                     FEMALE VOICE:  -- I know what you mean.

11                     MR. LINDKE:  Then the next one says, um, you

12         will not break my will.

13                     FEMALE VOICE:  Okay.

14                     MR. LINDKE:  And then the last sentence is you

15         will not break me.

16                     FEMALE VOICE:  That's it?

17                     MR. LINDKE:  Yep, that's it.  And then tell her,

18         you know, like one sentence, type the first sentence and

19         then space down twice, type the second sentence.

20                     FEMALE VOICE:  Yep, and then I'll just say --

21                     MR. LINDKE:  Space down.

22                     FEMALE VOICE:  -- copy and paste it just like

23         this.

24                     MR. LINDKE:  Right.  I mean she'll know if you

25         just give her the stuff, you know what I mean, but yeah,
```

```
 1        if you write it --
 2                  FEMALE VOICE:  Right.
 3                  MR. LINDKE:  -- whatever so she'll figure it
 4        out.  But tell her to post it from as Justice for O█████.
 5        She'll have to do it on my phone.
 6                  FEMALE VOICE:  Okay.
 7                  MR. LINDKE:  That's it.
 8
 9                  (March 28, 2019, Call 4, 0:17 to 1:23.)
10
11                  MR. LINDKE:  Hey.
12                  FEMAIL VOICE:  Hi.
13                  MR. LINDKE:  Did Jaz text you?
14                  FEMAIL VOICE:  Yeah, she called me.
15                  MR. LINDKE:  All right.  .Yeah, just post that,
16        um, as soon as you can, um, as the Justice for O█████ page
17        though.
18                  FEMAIL VOICE:  Okay.
19                  MR. LINDKE:  And then, ah, I won't be able to
20        call tonight when you have the rally so --
21                  FEMAIL VOICE:  Okay.
22                  MR. LINDKE:  -- have the ... (inaudible) ... bug
23        night.
24                  FEMAIL VOICE:  What is it?
25                  MR. LINDKE:  Bug night where they spray for
```

```
 1       bugs.
 2               FEMAIL VOICE:  Oh.
 3               MR. LINDKE:  Like in lock down.
 4               FEMAIL VOICE:  Right.
 5               MR. LINDKE:  So, we get --
 6               FEMAIL VOICE:  Right.
 7               MR. LINDKE:  -- locked down at 6:30 or something
 8       so I won't be able to call.
 9               FEMAIL VOICE:  Okay.
10               MR. LINDKE:  So how many people you think are
11       coming?
12               FEMAIL VOICE:  I don't know.  It seems like a
13       lot, but when you, I don't know til we get there.
14               MR. LINDKE:  I mean like 50 a lot or like 300 a
15       lot?
16               FEMAIL VOICE:  I don't know.  Some people think
17       there's going to be like hundreds and some people just
18       aren't sure.  I don't know.
19               MR. LINDKE:  All right.
20               FEMAIL VOICE:  I mean like all our friends are
21       coming.
22               MR. LINDKE:  Right. .
23               FEMAIL VOICE:  So --
24               MR. LINDKE:  Well, yeah, when you post it like
25       post the first sentence and then space, you know, two
```

```
 1        spaces.

 2                    FEMAIL VOICE:  Okay.

 3                    MR. LINDKE:  And then post the second sentence

 4        and then two spaces.  Post the third sentence.  You know

 5        what I mean?  Like you know --

 6                    FEMAIL VOICE:  Yep.

 7                    MR. LINDKE:  -- how I do it on there?

 8                    FEMAIL VOICE:  Yeah.

 9

10                    (March 30, 2019, Call 5, 3:25 to 6:39.)

11

12                    MR. LINDKE:  Are you posting as yourself or as

13        Justice, as Justice page?

14                    FEMALE VOICE:  As myself.

15                    MR. LINDKE:  Then you have the log in

16        information though for my account, don't you?

17                    FEMALE VOICE:  For your private one?

18                    MR. LINDKE:  Yeah, has -- yeah.

19                    FEMALE VOICE:  Yeah.

20                    MR. LINDKE:  Has anyone posted as Justice for

21        O█   at all?

22                    FEMALE VOICE:  Ah, Mom did.

23                    MR. LINDKE:  All right.  It's important that

24        that, you post under Justice for O█ .

25                    FEMALE VOICE:  I'll make sure that she does.
```

```
 1        She's at that scrapbooking thing so I called her earlier,

 2        she didn't --

 3                  MR. LINDKE:  I know.  My --

 4                  FEMALE VOICE:  -- answer me.

 5                  MR. LINDKE:  I know I've talked to her like four

 6        times ... (inaudible) ...

 7                  FEMALE VOICE:  Oh.

 8                  MR. LINDKE:  So, and then, ah, then make sure

 9        that you're posting in Keith Wesley too.

10                  FEMALE VOICE:  All right.

11                  MR. LINDKE:  Because that's going to fucking,

12        under, that's just going to negate their whole argument

13        that it's me doing it, you know what I mean?

14                  FEMALE VOICE:  Right.

15                  MR. LINDKE:  It's like I wanted to ask Tina too,

16        like how do you know that Justice for Oa███ isn't posting

17        when I'm in jail, why are you on the page?  You know what

18        I mean?

19                  FEMALE VOICE:  Right.  All that's just

20        ridiculous.  It's just, oh man.  He just allows people to

21        lie, so that's the part that's frustrating.

22                  MR. LINDKE:  I just can't believe this many

23        people are just flat out fucking liars.  And if they lie

24        --

25                  FEMALE VOICE:  Well, I can't believe that he
```

```
 1        knows they're lying.  I mean anyone would of -- he knew

 2        Renee was flat out lying.

 3                    MR. LINDKE:  Oh yeah.

 4                    FEMALE VOICE:  He just doesn't care.

 5                    MR. LINDKE:  He's a fucking liar too.  You know

 6        what I mean?

 7                    FEMALE VOICE:  Right.

 8                    MR. LINDKE:  So, like they, they don't have any

 9        problem fucking lying to cover their own ass or get what

10        they want.  It's fucking disgusting.

11                    FEMALE VOICE:  It is because everything that we

12        said is the truth, so that's what's really --

13                    MR. LINDKE:  Right.

14                    FEMALE VOICE:  -- like --

15                    MR. LINDKE:  Did Brenda Russell ever get back to

16        you?

17                    FEMALE VOICE:  No.  I can call her again on

18        Monday.

19                    MR. LINDKE:  Ah, not a big deal.  If this, if

20        this Sarah gets involved it's going to take care of

21        itself, you know what I mean.

22                    FEMALE VOICE:  Right.

23                    MR. LINDKE:  Especially to get the ACLU.  Which

24        the ACLU, like because they're going to hold a press

25        conference and everything.
```

```
 1              FEMALE VOICE:  Well, that's what needs to
 2    happen.
 3              MR. LINDKE:  Yeah.  Like once they, once --
 4    because they won't, they won't handle my case.  All they
 5    do is they attach themselves to it.
 6              FEMALE VOICE:  Right.  But just knowing --
 7              MR. LINDKE:  ... (inaudible) ...
 8              FEMALE VOICE:  -- that they're watching is kind
 9    of --
10              MR. LINDKE:  Right.
11              FEMALE VOICE:  -- A big deal.
12              MR. LINDKE:  Oh, what they'll do once they
13    attach themselves to my case they're going to, they'll
14    hold a press conference announcing the case, what they're
15    doing, their involvement in it and all kinds of shit.  I
16    mean FARA (phonetic) works, you know, she consults.  The
17    ACLU consults with FARA, you know what I mean?
18              FEMALE VOICE:  Right.  Right.
19              MR. LINDKE:  Whatever.
20              FEMALE VOICE:  It's just annoying, like
21    everything's a waiting game.
22              MR. LINDKE:  Yep.
23              FEMALE VOICE:  And in the meantime like you're
24    in jail for nothing.
25              MR. LINDKE:  Right.  It's a bunch of bullshit.
```

```
 1     Whatever.  If you see any posts from Tina -- oh, what else

 2     you needed to do post under the Justice page, post a

 3     picture of Ami, Renee and Tina and say this is Oa████'s

 4     maternal family who conspired together with the

 5     Prosecutor's office and the Judge to once again have

 6     Oa████'s father thrown into jail illegally and for --

 7              FEMALE VOICE:  Okay.

 8              MR. LINDKE:  -- no reason whatsoever.  But post

 9     all three of their pictures.

10              FEMALE VOICE:  All right.

11              MR. LINDKE:  And you should be able to pull them

12     off some of those other posts, you know what I mean?

13              FEMALE VOICE:  Yes, I have all of the posts on

14     there.

15              MR. LINDKE:  But post that as a Justice for

16     Oa████

17

18

19

20

21

22

23

24

25
```